OSCAR P. RIEGEL,

*vs.*

THE ONLY PACKAGE PIE, INCORPORATED, a corporation of the State of Delaware.

### *New Castle, March 6, 1925.*

That bill to enforce contract by corporation to issue one-half of its common stock to complainant failed to show that corporation had power to issue stock, and that such issuance would not be *ultra vires*, was not ground for demurrer, since it was not incumbent on complainant to show ability on part of corporation to perform contract; but, if such fact is a good defense, it should be raised by answer.

Where assignment to corporation by complainant of certain employment contracts was made a condition precedent to issuance by corporation to complainant of one-half of its common stock, in order to entitle complainant to decree compelling issuance of stock he must show performance of such condition.

When legal standard of consideration for stock, its quality and amount, is satisfied, a corporation may insist on any additional terms by way of contract it may choose.

Where corporation contracted to issue one-half of its common stock to complainant, but as condition precedent complainant agreed in addition to other legal consideration to advance $10,000 to corporation as working capital, complainant was not entitled to decree compelling corporation to issue stock, where he did not advance such working capital.

BILL IN EQUITY to compel the defendant to issue to the complainant certain shares of its authorized no par value common stock. The complainant bases his right to relief upon the following offer made by him and one Compton to the defendant which, the bill alleges, was duly accepted by it:

"November 22, 1922.

"To the Board of Directors 'The Only Package Pie,' Incorporated, No. 501 Fifth Avenue, New York City—Dear Sirs: In consideration of the issuance to them in equal shares or to their nominees of all of its common capital stock, and in further consideration of the issuance to George Brokaw Compton or to his nominee of 100 shares of its preferred stock of the par value of one hundred dollars ($100) per share, Oscar P. Riegel and George Brokaw Compton, both of the Borough of Manhattan, City and State of New York, hereby make the following offer:

"(a) To cause Louise Allen's Kitchens, Inc., a corporation organized under the laws of the State of New York, to sell, assign, transfer, and set over to your company all of its assets of whatsoever nature and wheresoever located, upon the assumption by your company of all of the obligations and liabilities of the said Louise Allen's Kitchens, Inc., and upon its discharge of the said liabilities and obligations by the payment in cash of a total of $728.62 to cover all open accounts amounting to less than $100, by the payment in cash of 12% of $19,126.40, the balance due and payable as of November 8, 1922, on accounts payable of the Company, and by the payment of the balance of the said sum of $19,126.40, by the issuance of its notes payable to the extent of 5% of the said amount on May 15, 1923, to the extent of 5% thereof on November 15, 1923, to the extent of 20% thereof on May 15, 1924, and to the extent of 58% thereof on November 15, 1924, and by the issuance of its notes in the total amount of $18,845, payable December 31, 1925, to the holders of notes of the said Louise Allen's Kitchens, Inc.

"(b) To issue and exchange $8,420, par value of its preferred stock for common stock of Louise Allen's Kitchens, Inc., to the same amount in par value and to issue its preferred stock in the amount of $10,600 par value in exchange for the same amount par value of preferred stock of the said Louise Allen's Kitchens, Inc.

"(c)  To assign to your Company employment contracts as follows:

"(1)  For the services of John Panton, Jr., as Sales Manager for the period ending December 31, 1924, or for such shorter period as your Directors may determine, at a salary of $125 per week until the weekly production of your Company shall have reached 15,000 pies and thereafter, during the balance of the said period, at a salary of $150 per week.

"(2)  For the services of Clarence R. Jones, as Production Manager for the period ending December 31, 1924, or for such shorter period as the Directors may determine, at a salary of $125 per week.

"(d)  To provide working capital for your Company in the amount of $20,000, upon the issuance to us or to our nominees of notes of your Company in that aggregate amount due December 31, 1925, the said notes to be secured by a pledge or mortgage of all of the assets of your Company including its lease or leases, its patents or patent rights, its trademarks or trade-names, its good-will, its trucks and automobiles and its rights under any agreement for the purchase of automobile trucks, its accounts receivable, and all its other property acquired from Louise Allen's Kitchens, Inc., or from other sources which it now owns or which it may hereafter acquire, the said notes to have priority over any other obligations of your Company and to become forthwith due and payable in the event of insolvency, of a general assignment for the benefit of creditors, or of bankruptcy, being then entitled to priority over any and all other claims against the receiver, trustee, or other representative of the bankrupt estate.

"Kindly indicate in writing within two days from the date hereof whether you will accept this offer.

"Very truly yours,
"[Signed] Oscar P. Riegel.
"[Signed] George Brokaw Compton."

The bill alleges that the terms and conditions of the offer in paragraphs (a) and (b) thereof have been complied with; it is silent as to whether the complainant and Compton have assigned the employment contracts mentioned in paragraph (c) of the offer; and as to the performance of the requirements of paragraph (d) of the offer, the bill sets forth that while the complainant has loaned some money to the defendant as the said paragraph requires, yet he has declined to advance the full sum of ten thousand dollars and still declines to do so until his status in the corporation under certain arrangements entered into by its promoters has been restored and until he has received from the defendant evidence of his equal voice in the management and control, which it was agreed by his associates in the enterprise he should have.

The defendant has demurred to the bill. The opinion of the Chancellor notices the causes of demurrer chiefly relied upon by the defendant.

*James I. Boyce,* for the complainant.

*William S. Hilles,* for the defendant.

THE CHANCELLOR. The complainant must rest his case on the written proposal made by him and Compton and which appears in the statement of facts. The negotiations which went on from time to time among the persons interested in this corporation and its predecessor, the Louise Allen's Kitchens, Inc., a corporation of New York, culminated in the making of said offer and so far at least as the defendant is concerned are merged therein. I, therefore, think that all those allegations of the bill which deal in considerable detail with Louise Allen's Kitchens, Inc., the efforts to refinance it, and the negotiations and undertakings of the several individuals interested therein are immaterial. They are sought to be justified by the complainant on the theory that they are necessary to a correct understanding of the terms of the offer made to the defendant by the complainant and Compton and accepted by it. It is of course true that in ascertaining the meaning which the parties to a contract intend to express, the court may look into the situation as it existed at the time the contract was made and consider all its surrounding circumstances. But I am unable to discover anything in the details of allegation just referred to, which are necessary or helpful to a clear understanding of the terms of the proposal upon which the pending bill is founded.

The question raised by the demurrer touching the contract is that the complainant is not entitled to have one-half of the defendant's stock issued to him because the bill fails to show that he has performed the terms which under the offer are conditions precedent to his right to demand the stock. The allegations referred to in no wise explain or throw light upon the meaning of these terms. So far, therefore, as now appears the demurrer is well taken in this particular.

The defendant's demurrer further raises the point that the complainant is not entitled to have one-half of its authorized stock (250 shares) issued to him for the reason that the bill fails

to show that the defendant has corporate power to issue two hundred and fifty shares of its stock or that such issue will not be *ultra vires*. This is not a valid objection. If the defendant is unable to obey such decree as the bill seeks, and if such fact is a good defense to the bill, the defendant should bring it forward by way of answer. It is no more incumbent upon the complainant to show ability on the part of the defendant to perform its contract solemnly entered into, as the bill shows this one to have been, than it is upon the vendee in a bill for specific performance of a contract to sell land to show that his vendor is possessed of the title engaged by him to be conveyed.

Another reason urged against the right of the complainant to a decree for the two hundred and fifty shares is that under the terms of the proposal he is not entitled to the shares until he has complied with the terms and conditions set forth in paragraphs (c) and (d) thereof. This contention is well made because the performance of these terms, unless waived or excused, is under the terms of the contract made a condition precedent to the complainant's right to the stock.

What does the bill show with respect to performance of the things referred to in these two paragraphs? With respect to whether the complainant ever made an assignment of the employment contracts mentioned in (c), the bill is silent. It should show a performance of this condition or offer some satisfactory explanation for not complying therewith. It was indicated at the argument that there were no such contracts in existence, that all sides knew this, and consequently (c) as written was incapacbie of literal performance. Such facts, however, are not disclosed by the bill and accordingly, assuming them to be sufficient to excuse performance, cannot be considered.

But more important than what has just been said with respect to (c) is what follows with respect to the obligation imposed upon the complainant by the lettered paragraph (d). The complainant has not complied with the requirement imposed by this paragraph, that he provide ten thousand dollars as working capital to be protected by secured notes, and alleges his determination not to do so until he secures a fifty per cent. voting control of the corporation which it was agreed among his associates he should have

—that is to say, until he has first received the two hundred and fifty shares which carry such voting control. The obligation to supply a loan of ten thousand dollars for working capital is denominated by the complainant as an independent undertaking, by which is meant, I suppose, that it is in no wise to be regarded as connected with the defendant's obligation to issue the stock. I cannot so view the matter, for it seems plain that the undertakings of each of the parties are mutually conditional upon performance or willingness to perform on the part of the other.

But, the complainant argues, a promise to lend money is not a lawful consideration for the issuance of stock by a corporation organized under the law of this State, and accordingly where full lawful consideration has otherwise been paid for stock as here (viz., in the transfer of all the assets of the Louise Allen's Kitchen, Inc., a concern in which the complainant had put considerable money), the corporation cannot lawfully demand as additional consideration for its stock something which the law refuses to recognize as having value. It may be taken as true that a promise to lend money to a corporation is not such a consideration for stock as will satisfy the constitutional and statutory requirements of this State. But it does not follow that a corporation may not in agreeing to sell its stock stipulate as a matter of contract that in addition to paying full lawful consideration therefor the subscriber or purchaser shall also lend money to it. There is nothing unlawful about such an arrangement. Our constitution and statute prohibit corporations organized under the general law from issuing stock "except for money paid, labor done, or personal property, or real estate, or leases thereof actually acquired." If stock is issued and fully paid for by property of any of these kinds, the lawful requirement is satisfied. There is no provision in the law which forbids the exaction of something additional. When the legal standard of consideration for stock, its quality and amount, is satisfied, the corporation is at liberty to insist on any additional terms by way of contract it may choose, whether such additional terms will furnish what in the first instance would be a lawful consideration or not.

The complainant not having advanced the working capital

as he engaged to do and not tendering himself willing to do so, the demurrer is for this reason also well taken.

The demurrer will be sustained.